Filed 3/23/26  City of Desert Hot Springs v. CA CFK CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CITY OF DESERT HOT SPRINGS, | |
| Plaintiff and Respondent, | E082805 |
| v. | (Super.Ct.No. CVPS2104940) |
| CA CFK, LLC, | OPINION |
| Defendant and Appellant; | |
| RICHARDSON GRISWOLD, | |
| Receiver and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Kira L. Klatchko, Judge.  Affirmed.

Prometheus Civic Law and Matthew Sean Harrison for Defendant and Appellant.

Stream Kim Hicks Wrage & Alfaro, Theodore K. Stream, and Krystal N. Lyons for Plaintiff and Respondent City of Desert Hot Springs.

1

Richardson C. Griswold, in pro. per.; and Jarrod Ready for Receiver and Respondent.

Defendant and appellant CA CFK, LLC (CA CFK) purchased a dilapidated property that was under receivership, and the property was sold to a third party after CA CFK breached an abatement compliance agreement between it and plaintiff and respondent City of Desert Hot Springs (the City). CA CFK appeals from the order allowing the receiver to list the property for sale and the later order approving the sale. We affirm.[1]

## I. BACKGROUND

A company called Yeh Dynasty owned a 98-room hotel located in Desert Hot Springs (the property). In 2021, the City filed this lawsuit, suing Yeh Dynasty and its owner Charles Yeh and seeking, among other things, the appointment of a receiver over the property to oversee abatement. The City alleged that local gangs had "taken root" at the hotel, "using it as a waystation for stolen vehicles, illegal firearms, and illegal drugs." Before filing suit, the City had issued a Notice of Public Nuisance and Order to Abate, and the complaint sought appointment of a receiver pursuant to section 17980.7,

---

[1] Undesignated statutory references are to the Health and Safety Code.

2

subdivision (c).[2] The trial court appointed respondent Richardson Griswold as the receiver.

The receiver sought authorization to list the property for sale. He stated that the hotel could be rehabilitated, demolished, or sold, and that neither rehabilitation nor demolition was financially feasible. As to rehabilitation, the cheapest bid he received was for $4.5 million, but the most a lender would lend for rehabilitation was $3.4 million. As to demolition, the receiver estimated that the bare land the property sat on was worth less than the cost of demolishing the property. The trial court authorized the listing.

Later, the receiver sought confirmation of the sale to a buyer who submitted a $1 million bid. Before the trial court confirmed the sale, however, Yosef Suh, through his company CA CFK, offered to purchase the property for $1.5 million. Suh stated that he has known Yeh for many years and was familiar with the property's history. The trial court confirmed the property sale to CA CFK, and the sale closed in December 2022.

As part of the sale, CA CFK and the City signed a compliance agreement. The agreement provided that CA CFK would abate the property and that CA CFK would be bound by the court's earlier receivership order, which generally ordered defendants (at the time, just Yeh and Yeh Dynasty) to turn over possession of the property and prohibited interfering with the receivership. The compliance agreement also contained

---

[2] Section 17980.7 provides that "[i]f the owner fails to comply within a reasonable time with the terms" of an abatement order issued under section 17980.6, then under subdivision (c), "[t]he enforcement agency . . . may seek and the court may order, the appointment of a receiver for the substandard building."

3

certain deadlines for the abatement work, such as a site inspection within 30 days of closing and permit applications within 90 days of the site inspection.

Three months after the site inspection, CA CFK's project manager requested a 90-day extension from the City, which it denied. After the receiver noted CA CFK's breach of the compliance agreement to the court and sought further instructions, CA CFK and the City signed an amendment to the compliance agreement. The amended agreement contained the following terms, repeatedly stating that noncompliance would be deemed material breaches:

"Buyer agrees to complete the following tasks according to the schedule as set forth below:

"1. **June 16, 2023**—Buyer shall obtain all necessary permits, including but not limited to a Demolition Permit, from the City to remove the exterior rock façade from the building on the Property, install and maintain adequate landscaping, resurface and repair the surface and features in the parking lot, and start demolition of all interior walls and floors as-needed to allow a qualified engineer to conduct a complete structural analysis of the building on the Property. Nothing in this Agreement shall be construed to guarantee the Buyer any permits. The failure of the Buyer to secure permits or complete the tasks described in this provision shall constitute a material breach of this Agreement. [¶ . . . ¶]

"3. **August 16, 2023**—Buyer shall submit a complete set of buildings plans to rehabilitate the Property, including but not limited to, engineering, architectural, mechanical, electrical, plumbing, Title 24 requirements. The Buyer must formally

4

submit said plans through City-approved procedures, and pay fees as required by the City. The Buyer's failure to submit said plans shall constitute a material breach of this Agreement. The Buyer's submission of plans in a manner other than approved by the City shall constitute a material breach of this Agreement. The Buyer's failure to submit complete or adequate plans shall constitute a material breach of this Agreement. The City, in its sole discretion, shall determine whether the plans submitted by the Buyer, if any, are complete and adequate, including for the purpose of ensuring the completion of the Abatement Work.

"4. **October 16, 2023**—the Buyer must secure all necessary permits from the City, as determined by the City in its sole discretion, to begin the Abatement Work. As part of this process, the Buyer must complete any and all plan corrections as required by the City, in its sole discretion. Nothing in this Agreement shall be construed to guarantee the Buyer any permits nor to compel the City to issue any permits. The Buyer's failure to secure all necessary permits or complete plan corrections shall constitute a material breach of this Agreement."

CA CFK *applied* for the first of such permits on June 16, 2023, and the City issued it the following month. After the receiver informed the trial court of the delay and noted his concern that he did not believe CA CFK would meet the August deadline, the court authorized the receiver to contact the engineers CA CFK hired to discuss abatement plans.

Two months later, in September 2023 (i.e., after the August deadline had passed), the receiver informed the court that CA CFK had not even executed its contracts with its engineers yet. The receiver noted that the engineers required approximately $50,000 in retainer fees to execute the contracts. The receiver had asked CA CFK why the contracts had not been signed or the retainer fees paid, but CA CFK had not responded. The receiver believed it was thus "imperative" that CA CFK demonstrate proof of funds necessary to complete the property abatement and asked that the trial court require CA CFK to show it had at least $5 million. The $5 million amount was based on the earlier, $4.5 million bid to rehabilitate and adjusted upward for inflation and the scope of work excluded from that earlier bid. The trial court ordered the receiver to execute the engineering contracts and pay the retainer fees and ordered CA CFK to demonstrate proof of funds of $5 million by October 2023.[3]

In October, a third party named Jonathan Paye stated that CA CFK had transferred the property to his company, US Affordable Housing, LLC (US Affordable Housing), and that US Affordable Housing had $5 million for the property's abatement.

The receiver immediately sought an order to list the property for sale a second time. According to the receiver, not only did US Affordable Housing's articles of incorporation list Yeh as the company's organizer and agent for service of process, the transfer violated the terms of the receivership order, specifically its prohibition on

---

[3] Also in September, the complaint was amended to name CA CFK as a defendant.

6

defendants from "[e]ncumbering, mortgaging, likening, leasing, renting, selling or transferring the Subject Property or any interest in it." The trial court found that CA CFK had breached the amended compliance agreement, that it failed to timely demonstrate proof of funds, and that the transfer of the property to US Affordable housing was void. It also authorized the receiver to list the property for sale a second time. After listing the property and evaluating multiple bids, the receiver selected a bid for $700,000. The trial court later confirmed the second sale to that bidder in February 2024.

## II. DISCUSSION

CA CFK challenges the second order to list the property for sale and the later order approving the sale on multiple grounds. Before addressing CA CFK's arguments, we briefly address the City's contention that the second sale has rendered this dispute moot.

### A. Mootness

Relying on *City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670 (*Horspool*) and *First Federal Bank of California v. Fegen* (2005) 131 Cal.App.4th 798 (*First Federal*), the City asserts that the trial court's confirmation of the second sale—and CA CFK's lack of posting an undertaking—renders us incapable of providing effective relief. (See *Shaw v. Los Angeles Unified School Dist.* (2023) 95 Cal.App.5th 740, 772 ["'A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief'"].)

*Horspool* does not apply here. In *Horspool*, this court ruled that issues relating to the receiver's appointment were moot. (*Horspool*, *supra*, 223 Cal.App.4th at pp. 681-682.) In doing so, *Horspool* relied on Code of Civil Procedure, section 917.5, which by its terms pertains only to receiver appointments. (*Horspool*, *supra*, at p. 682; see Code Civ. Proc., § 917.5 ["The perfecting of an appeal shall not stay enforcement of the judgment or order in the trial court if the judgment or order appealed from appoints a receiver, unless an undertaking in a sum fixed by the trial court is given"].) Relying on *First Federal*, we then stated that "[a]n order *appointing a receiver* is not subject to appellate review after the receiver has settled accounts and been discharged because, at that point, the receiver and the court no longer have control of the subject matter of the receivership." (*Horspool*, *supra*, at p. 682, italics added.) Because CA CFK is not challenging the receivership order, *Horspool* does not show this case is moot.

*First Federal* also does not apply. There, the Court of Appeal relied on Code of Civil Procedure section 701.680, subdivision (a), which stated that "a sale of property *pursuant to this article* is absolute and may not be set aside for any reason." (*First Federal*, *supra*, 131 Cal.App.4th at pp. 800-801; Code Civ. Proc., § 701.680, subd. (a).) The article that Code of Civil Procedure section 701.680 refers to (Code Civ. Proc. § 701.510 et seq.) requires, among other things, that the property be sold to the highest bidder at a public auction (Code Civ. Proc. § 701.570). It does not apply here, so *First Federal* also does not help the City.

8

Code of Civil Procedure section 917.4 states that an appeal of a judgment or order directing the sale of real property is not stayed unless an undertaking is posted. Nevertheless, the completed sale does not mean we cannot provide the parties with effective relief. Other than Code of Civil Procedure section 701.680, which does not apply, the City has cited no authority that would preclude us from ordering the second sale set aside if CA CFK were to prevail here. We therefore proceed to CA CFK's arguments.

*B. Reasonable Time to Abate*

CA CFK contends that the trial court did not allow CA CFK a reasonable time and opportunity to complete its abatement work. It cites statutory and case law for the proposition that it was entitled to a reasonable time. (See § 17980.7; *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 921 (*Gonzalez*); *City of Desert Hot Springs v. Valenti* (2019) 43 Cal.App.5th 788 (*Valenti*); *Hawthorne Savings & Loan Assn. v. City of Signal Hill* (1993) 19 Cal.App.4th 148 (*Hawthorne*).)

The authorities CA CFK relies on, however, do not apply here, as they all pertain only to what a property owner is entitled to *before* the appointment of a receiver. Section 17980.7 states that "[i]f the owner fails to comply within a reasonable time with the terms" of an abatement order issued under section 17980.6, then the statute's provisions—such as subdivision (c), which allows for the appointment of a receiver— apply. The cases CA CFK relies on either discuss the reasonable time requirement in the context of section 17980.7 or involve a different statutory scheme. *Gonzalez* and *Valenti*

9

both discuss section 17980.7. (See *Gonzalez*, *supra*, 43 Cal.4th at p. 921 ["if the owner fails to comply with the notice to repair within a reasonable time, an enforcement agency, a tenant, or a tenant association or organization may seek an order from the trial court appointing a receiver"]; *Valenti*, *supra*, 43 Cal.App.5th at p. 794 [court must consider whether reasonable opportunity to abate has been given before appointing a receiver].) *Hawthorne* discusses section 17980, which our Supreme Court stated involves a different statutory scheme. (*Hawthorne*, *supra*, 19 Cal.App.4th at pp. 159-160; see *Gonzalez*, *supra*, at p. 933 [§ 17980 "is part of a different, albeit related, statutory scheme that authorizes enforcement agencies to take actions concerning substandard building without involvement of a receiver"].) Accordingly, CA CFK has not shown any error on this ground.

## C. Unconscionability

The amount of time CA CFK was entitled to here to abate the property is not governed by section 17980.7, but by the compliance agreement CA CFK entered into with the City. CA CFK separately argues that the compliance agreement is unenforceable under the doctrine of unconscionability.

"The general principles of unconscionability are well established. A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. [Citation.] Under this standard, the unconscionability doctrine '"has both a procedural and a substantive element."' [Citation.] 'The procedural element addresses the

10

circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.'" (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125.) "Both procedural and substantive unconscionability must be shown for the defense to be established, but 'they need not be present in the same degree.'" (*Ibid.*) "The burden of proving unconscionability rests upon the party asserting it." (*Id.* at p. 126.)

CA CFK does not support its unconscionability claim with any extended discussion of procedural or substantive unconscionability. At most, CA CFK contends, in a single sentence, that the "contextual application" of the compliance agreement was procedurally and substantively unconscionable, referring to an uncited motion for reconsideration. Stating that the City's *application* of the contract is unfair and one-sided, which appears to focus on the City's actions after the contract was formed, is different from arguing that the contract's terms are unfair and one-sided. (See *Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 493 ["'[W]hether a contract is fair or works unconscionable hardship is determined with reference to the time when the contract was made and cannot be resolved by hindsight by considering circumstances of which the contracting parties were unaware'"].) CA CFK also does not specify whether it is asserting unconscionability as to the original compliance agreement, the amended compliance agreement, or both.

11

"We are not obligated to make arguments for [parties] and may and do disregard conclusory arguments failing to disclose the reasoning by which [a party] reached the conclusions they ask us to adopt."  (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1031.)  We accordingly deem the argument forfeited.

D.  *Right to Choose Demolition*

CA CFK argues that it was denied its right to choose demolition.  It relies on section 17980, subdivision (c), which states that "[t]he owner shall have the choice of repairing or demolishing."  However, as discussed above, section 17980 "is part of a different, albeit related, statutory scheme that authorizes enforcement agencies to take actions concerning substandard buildings without involvement of a receiver."  (*Gonzalez, supra*, 43 Cal.4th at p. 933.)  *Gonzalez*, which, as here, involved a receivership pursuant to section 17980.7, emphasized that the choice between demolition and repair does not apply to section 17980.7 receiverships.  (*Gonzalez, supra*, at p. 934 ["we do not intend to suggest that [former] section 17980, subdivision (b)(1), applies here"]; see Stats. 2012, ch. 201, § 2 [moving choice of demolition or repair to subdivision (c)].)  As a result, no reversible error resulted from the lack of such a choice in either compliance agreement, contrary to what CA CFK claims.

E.  *Vested Right to Complete Construction*

"[I]f a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit."  (*Avco*

12

*Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791

(*Avco*).) Citing this rule, CA CFK contends that it had a vested right to complete the

work on the permit the City issued.

CA CFK has not shown any vested right here. Even if we were to assume that the

rule would generally apply in this situation, CA CFK fails to show that it "performed

substantial work and incurred substantial liability in good faith reliance" on the City's

permit. In *Avco*, where our Supreme Court found that the developer had no vested right

to complete the development, the developer had subdivided and graded its property,

spending nearly $3 million in the process. (*Avco*, *supra*, 17 Cal.3d at pp. 789-790.)

Here, CA CFK does not substantiate its claim that it performed any work on the permit.

The permit allowed for the removal of damaged areas of the property, including a rock

veneer, and stated that a lead and asbestos report needed to be provided before any work.

CA CFK does not state, much less show, that it removed any damaged areas or provided

such reports in either its argument section on this issue or in its statement of facts. CA

CFK emphasizes that it spent $1,500,000 purchasing the property, but that does not show

it incurred a substantial liability in reliance on the later-issued *permit*. Because it has

shown neither substantial work nor substantial liability, CA CFK has demonstrated no

vested right to complete construction.

## F. *Proof of Funds*

CA CFK next contends that the trial court's order that CA CFK demonstrate proof

of funds in the amount of $5 million to carry out the abatement work was "clearly

13

arbitrary." It also contends that CA CFK's failure to demonstrate it had the $5 million "formed the primary basis" for the trial court's order to list the property for sale a second time. According to CA CFK, because the proof of funds order was arbitrary, the second listing order must be set aside.

The proof of funds order was not arbitrary. In a status report filed a month before the proof of funds order, the receiver noted that CA CFK had yet to execute its engineering contracts or pay the approximately $50,000 in retainer fees required to execute those contracts. The status report was filed roughly nine months after CA CFK purchased the property. The failure to pay even the retainer fees several months after obtaining the property reasonably gave the receiver concern that CA CFK was unable or unwilling to pay for the costs of abatement. The receiver noted that he arrived at $5 million for the proof of funds amount based on the $4.5 million bid he received earlier for abating the property (i.e., before the property was instead sold to CA CFK), plus an increase to account for inflation and work that was excluded from the bid.

Moreover, even if we were to assume for the sake of argument that the proof of funds order was arbitrary, CA CFK would not have demonstrated reversible error. Although CA CFK claims without support that the proof of funds order "formed the primary basis" for the sale order, that sale order expressly found that CA CFK was "in breach of the Compliance Agreement and the First Amendment to the Compliance Agreement." The order does not state the basis for the finding—the compliance agreements did not have a proof of funds requirement—but the record establishes that

14

CA CFK violated the amended compliance agreement by failing to obtain necessary permits by June 16, 2023. CA CFK *applied* for the first such permit on the deadline, and the permit itself was not issued until a month later. CA CFK does not explain why breaching the agreements would not have constituted a sufficient basis for the sale order. If, for instance, CA CFK could not comply with the contractual terms and timely abate the property, then the receiver would have had good reason to seek to sell the property to someone who could. CA CFK has therefore not shown prejudice from the proof of funds order, even if we were to assume it was arbitrary. (Cal. Const., art. VI, § 13; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108 [prejudice requirement "applies to both constitutional and nonconstitutional errors"].)

## G. *Necessity for the Sale*

CA CFK argues that the receiver failed to demonstrate that the second sale of the property was necessary. In support, CA CFK cites *Cal-American Income Property Fund VII v. Brown Development Corp.* (1982) 138 Cal.App.3d 268 (*Cal-American*), where the Court of Appeal stated that a receiver must "establish actual, not imaginary, necessity for the sale [and that] the sale had to be consummated at that time." (*Id.* at p. 275.)

As discussed immediately above, however, the receiver had good reasons to seek the second sale of the property. In the several months after CA CFK purchased the property, not only had it not begun any abatement work, it had not even executed its engineering contracts. It failed to show it had funds reasonably necessary to complete the

15

abatement project.  It even failed to show it had one percent of those funds, since that was roughly the amount necessary to retain the engineers.

In arguing otherwise, CA CFK argues it was denied a reasonable time to complete the work, an argument we have already rejected.  It also again makes conclusory assertions, such as by stating (without any further discussion or citation to the record) that "[t]he hearing transcript demonstrates the extent to which the trial court's order was based on its exasperated impatience with Yeh Dynasty generally, as opposed to the specific facts and circumstances applicable to CA CFK."  It argues that *Cal-American* applies here because there the court held that the loss of property to creditors was necessary to show justification for an immediate sale.  (*Cal-American*, *supra*, 138 Cal.App.3d at p. 275 ["The evidence had to show both the property would be lost to creditors at some future time unless the court ordered the sale and the sale had to occur within a specified time to avoid such a loss"], fn. omitted.)  However, under CA CFK's reading, a sale of the property would never be justified, as there are no documented creditors with interests in the property.  *Cal-American* did not involve section 17980.7 or red-tagged property, and its emphasis on demonstrating a necessity of sale by focusing on creditors does not apply here.  We find no error regarding the necessity of the second sale order.

## H.  Breach of Fiduciary Duties

Citing a statement from *Security Pacific National Bank v. Geernaert* (1988) 199 Cal.App.3d 1425 that "a receiver acts as a fiduciary on behalf of both parties" (*id.* at p.

1432), CA CFK next contends that the receiver breached his fiduciary duty by failing to clean up trash and debris at the property. According to CA CFK, the receiver's failure to remove trash and debris from the property led to the trial court describing the property as an "absolute mess," which then led to its proof of funds order.

The argument does not withstand scrutiny. For one, CA CFK concedes in its reply brief that the issue is "largely a red herring" (capitalization changed). For another, the order CA CFK refers to authorized the receiver to "[r]emove the dead vegetation, trash and debris" from the property," but that order in no way relieved CA CFK of its obligation to dispose of debris as a preliminary step toward abatement. The fact that the receiver was authorized to take an action does not automatically imply that CA CFK was prohibited from taking the same action. CA CFK is therefore in no position to fault the receiver for the physical condition of the property. And as discussed above, the trial court's proof of funds order was reasonably predicated on CA CFK's failure to execute its engineering contracts or pay retainer fees, even if other circumstances (such as the property's condition) might have also led to the order. CA CFK does not show that the receiver breached any of his duties.

*I. Void Property Transfer*

CA CFK argues that the trial court erred in finding CA CFK's transfer to US Affordable Housing violated prior court orders. The finding is part of the trial court's order authorizing the receiver to list the property for sale a second time, which, as discussed above, could reasonably have been based on a finding that CA CFK breached

17

the compliance agreements. CA CFK's argument here does not address why an erroneous finding unrelated to that breach would make the sale order an abuse of discretion.

In any event, the argument fails on its own terms. The receivership order prohibited defendants, "their partners, assignees, successors, representatives, managers, agents, attorneys, employees and all persons acting under or with concert with" defendants from, among other things, "[e]ncumbering, mortgaging, likening, leasing, renting, selling or transferring the [property] or any interest in it." In signing the compliance agreement, CA CFK agreed to be bound by the receivership order. Thus, when CA CFK transferred the property to US Affordable Housing, it violated the receivership order.

CA CFK argues that we should not "strictly" construe the receivership order in this way because under a literal reading, CA CFK would never have been authorized to abate the property in the first place. But again, CA CFK does not cite anything in the record for such a proposition, and we discern nothing from the receivership order that could reasonably be construed that way. Although CA CFK and related parties were prohibited from other actions such as collecting rents, interfering with the receiver's actions, canceling insurance coverage, commencing foreclosure, claiming state income tax deductions, or commencing actions impairing the receiver's ability to obtain title insurance, none of these would have related to abatement. Two abatement-related actions CA CFK and related parties could not take were entering the property or removing

18

personal property from the property, but both of these were prohibited only if done without first obtaining the receiver's written consent.  This is therefore not a case where, as CA CFK suggests, a literal reading of the receivership order would not make sense.

CA CFK also argues that the property transfer did not violate the receivership order because it was a "good faith effort to comply" with court orders, "proactively disclosed" to the trial court, and done "for no money."  None of these considerations bear on whether the transfer violated the terms of the receivership order, which it did.  CA CFK also contends that the trial court's order on the sale *to* CA CFK—which confirmed "[t]he sale of the real property . . . by Receiver to buyer CA CFK, LLC ("Buyer"), or its *assignee*" (italics added)—meant that CA CFK could later assign its interest in the property to another.  Under no reasonable reading, however, could this clause, which merely confirms a past sale, be construed to allow a future transfer to anyone CA CFK chose.

## J.  Ex Parte Relief

CA CFK's final argument is that the receiver unjustly moved for ex parte relief several times throughout the  litigation.  CA CFK never demonstrates, however, why any of the rulings on the ex parte applications were erroneous.  The only ex parte hearing CA CFK describes in any detail in this section of its brief is the hearing on the receiver's ex parte application for the second sale order.  CA CFK contends that Pae was unavailable, and that the hearing should have been delayed to a day when he could testify in person.  However, CA CFK makes no attempt to show how his testimony would have shown that

19

the property transfer complied with the receivership order, or how his testimony might otherwise have been relevant.[4]

## III. DISPOSITION

The October 18, 2023 order listing the property for sale and the February 23, 2024 order confirming the sale are affirmed. Respondents are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RAPHAEL</u>
J.

We concur:

<u>MILLER</u>
Acting P. J.

<u>LEE</u>
J.

---

[4] We deny CA CFK's request for judicial notice as irrelevant. (See *People ex rel Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 [judicially noticed materials "must be relevant to a material issue"].) Several of the documents are trial court filings in a different case involving the City that CA CFK believes shows the City and the receiver acted in bad faith. Two documents are public record requests relating to the property following the second sale, which CA CFK also believes shows the City is acting in bad faith. Other documents are historical statutes showing amendments to various Health and Safety Code provisions.

The issues that CA CFK raise do not require us to consider whether the City or the receiver acted more or less favorably to other owners of blighted property. Moreover, the historical statutes CA CFK cite are published materials. "A request for judicial notice of published material is unnecessary. Citation to the material is sufficient." (*Quelimane Co v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47, fn. 9.)